UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE L. THOMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18 CV 453 DDN |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security finding that plaintiff Michelle Thompson is not disabled and, thus, not entitled to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

**I.   BACKGROUND**

Plaintiff was born on February 28, 1971. (Tr. 127). She filed her application for DIB on January 15, 2015, alleging an onset date of June 18, 2014. (Tr. 127). In her application, plaintiff claimed that she suffers numbness in her hands and feet, numbness in her stomach, weakness on the left side of her body, diabetes, and blood pressure issues. (Tr. 150). Her date last insured was December 31, 2018. (Tr. 147). On March 3, 2015, plaintiff's

---

[1] The Court takes judicial notice that on June 4, 2019, the Hon. Andrew M. Saul became the Commissioner of Social Security. *See* https://www.congress.gov/nomination/116th-congress/94. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit by reason of 42 U.S.C. § 405(g) (last sentence).

application was denied, and she requested a hearing before an administrative law judge ("ALJ"). (Tr. 65, 71). Plaintiff and a vocational expert ("VE") testified at the hearing on January 24, 2017. (Tr. 35-51). By decision dated April 5, 2017, the ALJ found that plaintiff was not disabled under the Social Security Act. (Tr. 15-23). The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform her past relevant work. *Id.*

On January 25, 2018, the Appeals Council of the Social Security Administration denied plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner to be reviewed in this case. (Tr. 1-5). Plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, she asserts that the ALJ erred in failing to consider or improperly analyzing plaintiff's ability to regularly attend a workplace. (Doc. 17). Plaintiff asks that the ALJ's decision be reversed and remanded for further evaluation.

### A. **Medical Record and Evidentiary Hearing**

The Court adopts plaintiff's Statement of Material Facts (Doc. 17, Ex. 1) as clarified by defendant's response (Doc. 22, Ex. 1) in addition to defendant's Statement of Additional Facts (Doc. 22, Ex. 2), as clarified by plaintiff's response (Doc. 23, Ex. 1). Together, these facts represent a fair and accurate summary of the medical record and testimony as given at the evidentiary hearing. The court will discuss relevant facts as necessary to address the parties' arguments.

### B. **ALJ's Decision**

At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged onset date, June 18, 2014. (Tr. 17). She also found that plaintiff suffers from the severe impairments of diabetes mellitus with neuropathy and gastroparesis, hypertension, obesity, coronary artery disease, and history of cerebrovascular accident. (Tr. 17). However, the ALJ concluded that none of these impairments, individually or in

combination, met or equaled an impairment listed in the Commissioner's regulations. (Tr. 17-18).

The ALJ determined that plaintiff's impairments left her with the RFC to "perform a range of sedentary work as defined in 20 C.F.R. 404.1567(a)":

> She is able to lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours in an 8-hour workday; and stand or walk for 2 hours in an 8-hour workday, but for no more than 30 minutes at a time. She can never climb ropes, ladders, or scaffolds, but occasionally climb ramps and stairs, balance, stoop, kneel crouch, and crawl. She must have no exposure to extreme heat, extreme cold, humidity, wetness, vibration, unprotected heights, hazardous machinery, dust, fumes, odors, gases, and poor ventilation.

(Tr. 18). In making this determination, the ALJ considered the objective medical evidence in the record, opinion evidence, and plaintiff's allegations and testimony. (Tr. 17-22).

The ALJ found that plaintiff had some medical problems, but none that caused her to be completely disabled. She noted plaintiff had severe diabetic gastroparesis in August 2014, November 2014, late 2015, and early 2016, but that she was stable between those hospitalizations and had not had a hospitalization between March 2016 and April 2017. The ALJ further noted that when plaintiff is compliant with her diabetes treatment plan, hospitalizations should not be necessary, and that even with her historical hospitalizations, she would not have missed two or more days a month due to the gastroparesis. Additionally, the ALJ found that there was no objective medical evidence in the record that she had experienced a stroke, other than plaintiff's report of that in her history. The ALJ noted that there was little other evidence in the record to support any weakness in her left side and that, on the contrary, she could perform sedentary work after her alleged stroke. However, the ALJ found that plaintiff's obesity and diabetic neuropathy do affect her lower extremities and limit her ability to do sedentary work, though she retains the use of her hands.

In terms of opinion evidence, the ALJ discounted the opinion of plaintiff's primary care doctor, Edwin Schmidt, M.D. Dr. Schmidt opined that plaintiff would miss work more than three times a month because of her gastroparesis. However, the ALJ found this opinion was not supported by Dr. Schmidt's own records, nor the record as a whole. Based on the

testimony of a VE, the ALJ concluded that plaintiff could perform her past relevant work of an insurance clerk or hospital admitting clerk. (Tr. 17-23).

## II. DISCUSSION

Plaintiff argues that the ALJ erred in failing to consider the significance of regular attendance at a workplace, plaintiff's "consistent evidence" that she could not maintain regular attendance at a workplace, and plaintiff's frequency of unscheduled medical care. The Court disagrees.

### A. General Legal Principles

In reviewing the denial of Social Security disability benefits, the court's role is to determine whether the Commissioner's findings comply with the relevant legal standards and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).

To be entitled to disability benefits, a claimant must prove that she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 CFR § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her severe impairment(s) meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). *Id.* at § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show that the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(a)(4)(v).

B.  **Evidence of Irregular Workplace Attendance**

A claimant's ability to regularly attend the workplace, without frequent absences, is a significant factor to be considered by the Commissioner at Steps Four and Five. *See, e.g., Maresh v. Barnhart*, 438 F.3d 897, 901 n.2 (8th Cir. 2006) (frequent absences can preclude employment). Social Security regulations encourage medical opinions on how many hours a claimant can work and how many absences might be required in a given week or month. *See* 20 C.F.R. § 404.1513(b); *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995) ("medical opinions on how much work a claimant can do are not only allowed, but encouraged.").

At plaintiff's hearing, she testified that she experiences extreme stomach pain with vomiting "[a]t least a couple times a month," with the vomiting persisting "all day." (Tr. 44-47). Plaintiff testified that on these days, she cannot work because she is "[p]reoccupied with trying to subside the vomiting." (Tr. 47). The VE testified that someone who missed work twice per month on an unscheduled basis would be terminated for absenteeism and unable to perform any work in the national economy. (Tr. 49-50).

In her disability report, plaintiff noted that her gastroparesis keeps her in the hospital with "lots of pain" and makes trying to work hard. (Tr. 153, 164). In plaintiff's brief, she

noted that between August 2014 and March 2016, she visited an emergency room or hospital for a total of 64 days, an average of more than 3 days per month:

| Date and Length of Stay | Complaint | ER or Admission | Transcript |
|---|---|---|---|
| **August 2014 to November 2014 (3 months)** | | | |
| August 18, 2014 (1 day) | Shortness of breath and chest pain related to a virus | ER | (Tr. 371) |
| August 22, 2014 (1 day) | Shortness of breath, chest pain, and abdominal pain | ER | (Tr. 389) |
| August 23–26, 2014 (4 days) | Abdominal pain and vomiting | Admission | (Tr. 192) |
| August 27–September 6, 2014 (11 days) | Continued abdominal pain and vomiting | Admission | (Tr. 226) |
| September 18, 2014 (1 day) | Vomiting, high blood sugar, hypertension | ER | (Tr. 288) |
| September 20–25, 2014 (6 days) | Abdominal pain and vomiting | Admission | (Tr. 307) |
| November 23–26, 2014 (4 days) | Abdominal pain and vomiting | Admission | (Tr. 440) |
| **December 2015 to March 2016 (3 months)** | | | |
| December 23, 2015 (1 day) | Abdominal pain | ER | (Tr. 943) |
| December 24, 2015 (1 day) | Pain and cramps | ER | (Tr. 958) |
| December 27–29, 2015 (3 days) | Chest pain and abdominal pain | Admission | (Tr. 875) |
| January 5–15, 2016 (11 days) | Chest pain, nausea, and vomiting | Admission | (Tr. 883) |
| January 26–27, 2016 (2 days) | Chest and epigastric pain | Admission | (Tr. 893) |
| February 9–13, 2016 (5 days) | Nausea, vomiting, and abdominal pain | Admission | (Tr. 903) |
| February 16–18, 2016 (3 days) | Chest pain and abdominal pain | Admission | (Tr. 913) |
| March 4–10, 2016 (7 days) | Chest pain and abdominal pain | Admission | (Tr. 928) |
| March 13–15, 2016 (3 days) | Chest pain and abdominal pain | Admission | (Tr. 970) |
| March 16–19, 2016 (4 days) | Chest pain and vomiting | Admission | (Tr. 995-97) |

With the exception of a brief visit to the emergency room in August 2014 (which was due to a viral upper respiratory infection (Tr. 375)), plaintiff's hospital visits were each related to her gastroparesis and accompanying vomiting, nausea, and abdominal or epigastric pain. As the ALJ noted, the treatment notes for these visits report multiple attempts to educate plaintiff on proper management of the gastroparesis, and indications plaintiff was not following treatment recommendations.

On September 2, 2014, plaintiff's nurse noted that plaintiff "was just admitted 8/23 – 8/26. She was discharged and returned 8/27. She was fully educated last admission. She states that she still has the information that I gave her last admission on gastroparesis. We reviewed eating smaller meals at a time and being more mobile after eating, eating less foods high in fat and fiber. She states understanding. I have consulted a dietician to also see her." (Tr. 255).

On September 6, 2014, plaintiff's treating doctor noted that plaintiff reported "she filled her prescription for her insulin and has been compliant." (Tr. 228). Plaintiff was educated on food choices for gastroparesis and "advised to have better control of her diabetes with close monitoring of her Accu checks[.]" (Tr. 228).

On September 22, 2014, the same nurse reported that plaintiff "states that she is tired of this pain and can't take it any longer. She states that her blood sugars have been well controlled at home. She has been eating small portions of foods like broth, jello; taking medications as ordered. 'I have been doing everything you guys told me to do.'" (Tr. 323). On September 24, 2014, the treating nurse noted that "We again discussed eating smaller more frequent meals and avoiding fried, fatty or fibrous foods. We discussed sitting upright or walking after meals to assist in motility." (Tr. 329).

On October 29, 2014, plaintiff's primary care doctor noted that plaintiff was noncompliant with her diabetic diet much of the time. (Tr. 644).

On November 26, 2014, plaintiff was instructed at discharge to limit her calories to 1800 calories per day, limit her sodium to 2 grams per day, and to increase her activity level as tolerated. (Tr. 443). She was provided with a meal plan and reviewed "carb counting,

avoiding sugar, sweets, and sugary beverages . . . fried foods and salt as well." (Tr. 470). The treating doctor at that time noted a history of "questionable compliance with medication" and that plaintiff was seeking pain narcotics. (Tr. 444-46).

In late December 2015, plaintiff was recommended a gastroparesis diet. (Tr. 875). A week later, in January 2016, plaintiff was re-admitted. (Tr. 886). She denied eating large meals or spicy foods, and she reported her sugars had been adequately controlled and she had been taking her medication. (Tr. 886). After 10 days in the hospital, plaintiff's symptoms were controlled when she had meals "as instructed (small volume and more frequent instead)." (Tr. 883). At that time, a second doctor noted that plaintiff was a narcotic seeker. (Tr. 893).

In February 2016, plaintiff received a stent and was instructed to continue a diabetic diet with low fat, low cholesterol, and low sodium. (Tr. 903, 905). In March 2016, plaintiff could tolerate a "diet with glucerna shakes," with treatment notes stating that opiates for pain control should be avoided and to give plaintiff an alternative pain medicine instead. (Tr. 928, 940). Plaintiff was instructed to eat small frequent meals, stay sitting for one hour after every meal, take nausea medication 30 minutes before meals, and stay on top of her diabetes. (Tr. 929-30). The doctor noted that erythromycin seemed to improve plaintiff's symptoms, but she was unable to afford the medications on discharge. (Tr. 936).

On March 17, 2016, a treating doctor stated he suspected all of plaintiff's symptoms were related to gastroparesis and counseled plaintiff regarding small meals. (Tr. 996). He noted that "[i]t is possible the patient has more GI symptoms rather than actual heart symptoms." (Tr. 973). On March 22, 2016, plaintiff saw a gastroenterologist, who noted that plaintiff reported taking medication differently than prescribed and that plaintiff's symptoms had "improved with conservative care." (Tr. 861).

Additionally, at multiple visits, although plaintiff arrived complaining of persistent vomiting, plaintiff did not vomit while in the emergency department or hospital. (Tr. 295 (September 18, 2014) ("no vomiting during ED stay"); Tr. 445 (November 23, 2014) ("[T]here was no evidence of any retching or vomiting noticed. There was no ba[g] to hold vomits next to her as well, and she seemed fairly comfortable" and, at 11:51 p.m., "there was

no vomiting reported ever since she came in the ER since noon today."); Tr. 949 (December 23, 2015) ("Pt has not vomited while in the ED").

After the major episodes in late 2014 and early 2016, plaintiff reported that her nausea and vomiting had subsided. On May 13, 2016, Dr. Schmidt noted that plaintiff had "no vomiting since out of hosp." when she had been compliant with diet and medication "most" or "all" of the time. (Tr. 810). On July 20, 2016, plaintiff reported to Dr. Schmidt an occasional upset stomach, "but no vomiting recently." (Tr. 831).

To the extent plaintiff argues that the ALJ erred in stating that "There is not a 12-month period where she would have missed two or more days a month due to the gastroparesis," (Tr. 21) the Court disagrees with plaintiff. Plaintiff argued that, between August 2014 and March 2016, plaintiff was in the hospital for 64 days, *an average of* more than three days per month. However, this belies the fact that for 14 of those 20 months, plaintiff had no hospital visits. The ALJ clearly explained that the statement in question was referring to plaintiff's actual periods of hospitalization, and not an average extrapolated per month over the entire time period. When put into context, the ALJ's meaning is clear: the ALJ stated that plaintiff had a period of hospitalizations beginning in August 2014 that resolved, and were followed by many months of stability, and then a second period of hospitalizations in late 2015 and early 2016, which also resolved. Accordingly, the ALJ did not err in stating that there is no 12-month period where plaintiff was in the hospital for two or more days every month, as this is an accurate reflection of the record.

C.  **Dr. Schmidt's Opinion**

Edwin Schmidt, M.D., plaintiff's internal medicine treating specialist, opined that plaintiff's condition was "likely to produce good days and bad days," with an "unpredictable pattern" in absences from work, but likely to produce more than three absences a month. (Tr. 1019).

An ALJ must give good reasons for the weight she assigns to the opinions in the record. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). Factors for evaluating opinion evidence include the relationship between a treating source and the claimant,

including the length, nature, and extent of examination; the degree to which the source presents an explanation and evidence to support an opinion; how consistent the opinion is with the record as a whole; and the training and expertise of the source. *See* 20 C.F.R. § 404.1527; SSR 06-3p.

A treating physician's opinion is generally given controlling weight when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Cline v. Colvin,* 771 F.3d 1098, 1103 (8th Cir. 2014); *see also* 20 C.F.R. § 404.1527. A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). However, that weight is neither inherent nor automatic, and it does not obviate the need to evaluate the record as a whole. *Cline,* 771 F.3d at 1103. The Commissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. *Id.*

Substantial evidence supports the ALJ's decision to discount Dr. Schmidt's opinion and not give it controlling weight. There is, furthermore, every indication that the ALJ weighed Dr. Schmidt's opinion against the mandatory factors of 20 C.F.R. § 404.1527(c). Just because an ALJ does not explicitly mention the factors does not mean that they were not taken into consideration. The ALJ must only give "good reasons" for the weight assigned, and has no burden to provide definite articulation. *See* 20 C.F.R. § 404.1527(c)(2); *see also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005); *Singh*, 222 F.3d at 452.

The ALJ stated she carefully considered Dr. Schmidt's statement but found it to be inconsistent with Dr. Schmidt's treatment notes and the record as a whole. (Tr. 22). *See Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."). As the ALJ noted, while Dr. Schmidt opined that plaintiff would miss more than three days a month, plaintiff had over a year of stability with no vomiting from November 2014 to December 2015. Furthermore, the ALJ noted that after plaintiff's flare-

up in December 2015 and early 2016, she again became stable in March 2016, reporting to Dr. Schmidt in May and July 2016 that she had no vomiting and only an occasional upset stomach. (Tr. 810, 831). Between the last visit in July 2016 and January 2017, when Dr. Schmidt issued the opinion in question, Dr. Schmidt did not record any further treatment notes. (Tr. 22, 831, 1019).

As far as the other inconsistent evidence of record, when plaintiff saw a specialist, a gastroenterologist, on March 22, 2016, she reported she was doing well. (Tr. 861). The ALJ further observed that plaintiff had not had another hospitalization for gastroparesis since March 2016, and there was no evidence, other than plaintiff's testimony, that she continues to suffer from abdominal pain and vomiting. As the ALJ noted, when plaintiff was treated with a gastroparesis diet, she recovered quickly. (Tr. 20). The ALJ found that plaintiff's testimony that she is incapacitated by vomiting a few days every month was not supported by the medical records.

Accordingly, this Court concludes that the ALJ considered plaintiff's history of treatment with Dr. Schmidt, including the frequency of examination and the consistency of his opinion with the entire record. The ALJ's decision to discount Dr. Schmidt's opinion was supported by substantial evidence, including plaintiff's long periods of stability, medical records noting plaintiff's lack of compliance related to her flare-ups, and plaintiff's improved stability with compliance. (Tr. 20).

At Step Four, plaintiff has the burden to prove she cannot return to her past relevant work. *See, e.g., Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004); *Masterson v. Barnhart,* 363 F.3d 731, 737–39 (8th Cir. 2004). The ALJ's determination that plaintiff failed to meet that burden is supported by substantial evidence. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).

### III. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                                          /S/   David D. Noce
                                     **UNITED STATES MAGISTRATE JUDGE**

Signed on July 30, 2019.